**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARY SPURR,<br>on behalf of Plaintiff and the class<br>members described herein, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| GREENLINE LOANS;<br>WAAWAATESI LLC;<br>LDF HOLDINGS, LLC;<br>JESSI LEE PHILLIPS LORENZO,<br>also known as Jessi Phillips Lorenzo,<br>formerly known as  Jessi Lee Phillips,<br>and JOHN DOES 1-20, | ) ) ) ) ) ) ) ) | DEMAND FOR TRIAL BY JURY |
| Defendants. | ) | |

## COMPLAINT – CLASS ACTION

1.     Plaintiff, Mary Spurr, brings this action against Defendants (a) Greenline Loans, (b) Waawaatesi LLC; (b) LDF Holdings, LLC; (c) Jessi Lee Phillips Lorenzo, also known as Jessi Phillips Lorenzo, and formerly known as Jessi Lee Phillips and (d) John Does 1-20, to secure redress for usurious and illegal loans (such as Exhibits A-H) made to Illinois residents.

2.     Plaintiff seeks damages pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.*, and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* (Count I – the Predatory Loan Prevention Act provides that violations are a violation of the Illinois Consumer Fraud Act), relief for unjust enrichment (Count II), and treble damages under RICO (Count III).

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, 28 U.S.C. § 1367 and 28 U.S.C. § 1332(d).

4.     The amount in controversy exceeds $5 million on a classwide basis, exclusive of interest and costs.  There are more than 100 class members.  On information and belief, no Defendant is a citizen of Illinois.

5.      This Court has personal jurisdiction over Defendants because they:

a.      Knowingly participated in the making and collection of unlawful loans to Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello,* 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures,* 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b.      Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

6.      Venue is proper because acts to obtain and collect the loans impacted Plaintiff in Illinois.

7.      Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiff

8.      Plaintiff Mary Spurr is a citizen of Illinois who at all times relevant has resided in Aurora,  Illinois.

9.      Plaintiff is the sole provider for her family and cares for her severely disabled husband.

### Defendants

10.      Greenline Loans is an entity that makes high-interest loans to consumers via the Internet.

11.      In 2020, Greenline Loans claimed to be "an economic development arm of, instrumentality of and a limited liability company wholly-owned and controlled by, the Ft. Belknap Indian Community of the Ft. Belknap Reservation Montana."  (Exhibit A)

12.      Until about March 2018, the Chief Executive Officer of Greenline Loans was Michelle Fox.  Ms. Fox stated that "High fees are key to making short-term lending profitable. On one Fort Belknap site, Greenline Loans, a customer borrowing $300 agrees to make six payments of $113.52 over three months, which works out to more than $680.  If the loan isn't paid, the lender can send it to a collections agency. Fort Belknap loans have a 10% default rate, Ms. Fox said."  (Exhibit I, pp. 5-6)

13.      According to the Better Business Bureau, "On August 10, 2020, Greenline Loans informed BBB that they have relocated to Lac Du Flambeau, WI." (https://www.bbb.org/us/mt/hays/profile/consumer-finance-companies/greenline-loans-1296-1000047534) (Exhibit J)

14.      Thereafter, Greenline Loans claimed to be Waawaatesi LLC d/b/a Greenline Loans, a limited liability company chartered under the Laws of the Lac Du Flambeau Band of Lake Superior Chippewa Indians.  (Exhibit C)

15.      The purported transfer of an online lender from one tribe to another is unusual and indicates that the lender is not really a tribal venture.  Rather, it is conducted by non-tribal persons,

and the change in affiliation represents a business decision by such persons.

16.     Waawaatesi LLC d/b/a Greenline Loans conducted business using the same website as the Ft. Belknap operation, www.greenlineloans.com.

17.     Borrowers using the Greenline Loans website could retrieve information about loans obtained through both the Ft. Belknap and Lac Du Flambeau operations.  (Exhibit K)

18.     Waawaatesi LLC is named as a Defendant herein.

19.     The Lac Du Flambeau operation was conducted by Defendant LDF Holdings, LLC ("LDF Holdings"), a limited liability company that claims to be wholly owned, indirectly, by the Lac du Flambeau Band of Lake Superior Chippewa Indians (the "LDF Tribe"). Its website claims that "LDF Holdings owns and manages the entire online lending business." (https://ldf-holdings.com/about)

20.     Defendant LDF Holdings is located at 2640 Thorofare Rd., P.O. Box 155, Lac du Flambeau, WI 54538.

21.     The LDF Tribe is a small, isolated, and economically depressed Indian Tribe located in rural Wisconsin.

22.     The president of LDF Holdings, LLC during 2020-2021 was  Jessi Lee Phillips Lorenzo, also known as Jessi Phillips Lorenzo, f/k/a Jessi Lee Phillips ("Lorenzo").

23.     According to her LinkedIn profile (Exhibit L), as well as information posted on LDF Holdings' website (Exhibit M, p. 4), Lorenzo was the president of LDF Holdings, LLC despite not being a member of the LDF Tribe.

24.     As president, Lorenzo directed and controlled the lending activities, policies and practices of LDF Holdings, LLC and Greenline.

25.     On information and belief, Lorenzo resides at 3303 W. North B Street, Tampa, FL 33609-1429.

26.     On information and belief, prior to becoming president of LDF Holdings, LLC, Lorenzo  worked for Triax Management and Dater Portfolio in 2015-2016 as "Director of

Sovereign Sales."

27.     Lorenzo has described her former employer's business model of selling tribal sovereign immunity to high-interest lenders as follows: "Our success formula is simple: Identify Great Tribes, Financiers, Servicers and Best in Class Legal Teams and have them work cooperatively to build a very profitable compliant business based upon consumer satisfaction."

28.     Lorenzo pursued the same business model through LDF Holdings, LLC.

29.     Defendants John Does 1-20 are other persons and entities that participated in the lending activities described herein.

30.     An article published in the LDF Tribe's newsletter, *Inwewin*, in July 2013 noted that the tribe had embarked on a new internet lending business. The article stated that "some view payday loan and internet lending businesses as predatory, with companies taking advantage of individuals already in unpleasant financial situations." The article also stated that "the Tribe has partnered with one of the largest and most experienced lending companies." (Exhibit N)

31.     Lacking both capital and experience, and in desperate need of money, the tribe attempted to rent out one of its few remaining assets – its sovereign immunity – to non-tribal persons and entities who agreed to pay the LDF Tribe a small percentage of each loan as a fee or commission.

32.     Within a short period of time, the LDF Tribe became one of the most prolific suppliers in the rental market for sovereign immunity, making "rent-a-tribe" agreements with over 50 different non-tribal investors.

33.     The LDF Tribe received between one and three percent of revenues from each of these lenders in exchange for the use of their name.

34.     Loan approval was made by the non-tribal owners of Waawaatesi LLC d/b/a Evergreen Services. Electronic documents were transmitted to a representative on LDF tribal soil in Wisconsin, who rubber-stamped approval for the loan while technically on the LDF Tribe's reservation. The loans are then funded from bank accounts to which the tribe has no access, and the

loans are serviced and collected by nontribal entities off the LDF Tribe's reservation.

35.     Brent McFarland, then the LDF Tribe's director of business development, told the Milwaukee Journal Sentinel that "we're looking for ways to leverage (the tribe's) sovereignty" for profit. Cary Spivak, "Lac du Flambeau Cheppewa enter payday loan business with eye to online gambling," Milwaukee Journal Sentinel, Dec. 29, 2013, http://archive.jsonline.com/business/lac-du-flambeau-chippewa-enter-payday-loan-business-with-eye-to-online-gambling-b99164952zl-237906421.html. (Exhibit O)

36.     The Tribe thereafter entered into "rent a tribe" arrangements with dozens of non-Native American investors from time to time.

37.     On information and belief, the real, beneficial owner of Greenline Loans was a non-tribal investor who contracted with LDF Holdings to make it a appear that the lending business was "tribally" owned, in exchange for about 2% of the revenues from the loans.

38.     The standard form loan documents used by Defendants contain telltale indicia of involvement by persons not connected with either the Ft. Belknap tribe or the Lac Du Flambeau tribe. For example, Exhibits C-H have a privacy policy (p. 10) that states that "Our affiliates include other business entities of the Big Valley Band of Pomo Indians of the Big Valley Rancheria."  The Big Valley Band of Pomo Indians of the Big Valley Rancheria is located in California and has nothing to do with the Lac Du Flambeau tribe, but is another tribe that is used by persons engaging in making usurious loans over the Internet.

## DEFENDANTS' LOANS

39.     Greenline Loans  made and continues to make loans through its website, www.greenlineloans.com (Exhibit P) to consumers at interest rates in excess of 300% annually.

40.     Greenline Loans did  business in Illinois over the Internet, via text message, via Automated Clearing House transactions, and over the telephone.

41.     Many of the loans made by Greenline Loans were made to Illinois residents, including Mary Spurr.

42.    These residents have received funds via ACH transfers into bank accounts located in Illinois. The loans also provide for repayment via ACH transfers.

43.    Greenline Loans' website  currently states that "Greenline Loans LLC, does not lend to residents of Arkansas, Colorado, Connecticut, Georgia, Illinois, Maryland, Minnesota, Montana, New Mexico, New Hampshire, New York, North Carolina, Pennsylvania, Puerto Rico, Vermont, Virginia, Washington, West Virginia, and Wisconsin."  (https://www.greenlineloans.com/) Previously, Illinois was not on the list.

44.    At the time of the loans to Plaintiff,  Greenline Loans thus affirmatively sought out Illinois residents for such loans.

45.    The funds lent are transferred by ACH credit to the borrowers' bank accounts throughout the United States.

46.    Repayment of the loans is made by ACH debit from the borrowers' bank accounts throughout the United States.

## **LOANS TO PLAINTIFF**

47.    "Greenline Loans" made the following loans to Plaintiff (among others) when purportedly owned by the Fort Belknap Indian Community:

| Date | Amount Financed | Disclosed APR | Exhibit | Number |
|---|---|---|---|---|
| 6/1/20 | $600 | 719.12% | A | 2297█ |
| 6/30/20 | $1000 | 727.10% | B | 2333█ |

48.    Plaintiff paid all of these loans in full.

49.     "Greenline Loans" made the following loans to Plaintiff when purportedly owned by the Lac du Flambeau Band of Lake Superior Chippewa Indians:

| Date | Amount Financed | Disclosed APR | Exhibit | Number |
|------|-----------------|---------------|---------|--------|
| 9/3/20 | $600 | 718.22% | C | 2398■■ |
| 9/16/20 | $400 | 720.66% | D | 2409■■ |
| 10/21/20 | $1000 | 715.06% | E | 2435■■ |
| 1/20/21 | $300 | 697.69% | F | 2515■■ |
| 6/28/21 | $1000 | 402.56% | G | 2695■■ |
| 7/19/21 | $1000 | 399.55% | H | 2708■■ |

50.     Plaintiff paid all of these loans in full.

51.     All loans were taken to pay for expenses related to the care of Plaintiff's disabled husband, including medicine, to pay for household items and utilities, or to cover other unexpected personal expenses.

52.     The loan agreements are standard forms.

53.     The loans were made for personal purposes and not for business purposes.

54.     The principal amount of each loan was transferred to Plaintiff's bank account in Illinois via ACH.

55.     The loans were made entirely via the Internet. Plaintiff located Greenline Loans while doing an internet search in Illinois, and included her Illinois address on the loan application.

56.     The loans were to be repaid via ACH

57.     Defendants' lending does not actually occur on any Tribe's reservation.

58.     Defendants have repeatedly called Plaintiff's phone, which has an Illinois phone number, to solicit further borrowing by offering "VIP Status" and sightly reduced (but still illegal) interest rates. Defendants have also sent her text messages and emails soliciting her for new loans.

59.     A significant majority of the transaction occurs within the State of Illinois – applying for the loan and receiving and collecting the funds.

-8-

60.     The place where a consumer is located when he or she submits an application via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.").

61.     Plaintiff has never set foot on the LDF Tribe's land or on the Ft. Belknap reservation.

62.     Loans to Illinois residents made in the same manner as the loan to Plaintiff are governed by the laws of the State of Illinois.

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

63.     Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq.* "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

64.     Under 815 ILCS 123/15-10-5(b), "Any violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

65.     Both before and after March 23, 2021, it was unlawful for anyone who did not have a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest.  205 ILCS 670/1.

66.     Any loans to Illinois residents at more than 9% that are made by unlicensed persons are void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void

and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

67.     Any loans to Illinois residents at more than 9% that are made by unlicensed lenders violate the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

68.     Illinois has a criminal usury statute defines the making of a loan by unlicensed persons at more than 20% interest as a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq*). It applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

69.     Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC,* 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.,* 16cv2781, 2017 U.S. Dist. LEXIS 64761, 2017 WL 1536427, *7 (D.N.J., April 28, 2017).

70.     The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *E.g., In the Matter of Red Leaf Ventures, LLC,* No. 12 CC 569 (https://www.idfpr.com/dfi/ccd/Discipline/RedLeafVenturesCDOrder12CC569.pdf), *In the Matter of Money Mutual, LLC*, No. 12 CC 408 (https://www.idfpr.com/dfi/ccd/Discipline/MoneyMutualCDOrder12CC408.pdf); *In the Matter of Hammock Credit Services*, No. 12 CC 581 (https://www.idfpr.com/dfi/ccd/Discipline/HammockCreditCDOrder12CC581.pdf); *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133 (https://www.idfpr.com/dfi/

CCD/Discipline/17CC133%20-%20Make%20Cents%20dba%20Maxlend%20Cease%20and%20De
sist%20Order%20Bob%208%2016%202017.pdf).

**RENT-A-TRIBE SCHEMES**

71.     In an attempt to evade prosecution under usury laws of states like Illinois, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as a "rent-a-tribe" scheme.

72.      In such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

73.     The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe.

74.     In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

75.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

76.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the

entities." *Breakthrough* at 1183, 1187-88.

77.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

78.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

79.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

80.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.,* No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

### COUNT I – PREDATORY LOAN PREVENTION ACT AND ILLINOIS CONSUMER FRAUD ACT

81.     Plaintiff incorporates paragraphs 1-80.

82.     This claim is against all Defendants.

83.     This claim is based on the loans in Exhibits G-H.

84.     Defendants contracted for and collected loans prohibited by the Illinois Predatory

Loan Prevention Act.

85.     Violation of the Predatory Loan Prevention Act is a violation of the Illinois

Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

## CLASS ALLEGATIONS

86.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and

(b)(3).

87.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan

was made in the name of Greenline Loans at more than 36% interest (all of its loans qualify) (c) on

or after March 23, 2021 and (d) where the loan was made or a payment made on the loan within

three years prior to the filing of this action.

88.     Plaintiff may alter the class definition to conform to developments in the case and

discovery.

89.     The class is so numerous that joinder of all members is not practicable. On

information and belief, based on the making of loans over the Internet using form documents, there

are at least 40 class members.

90.     There are questions of law and fact common to the class members, which

common questions predominate over any questions relating to individual class members. The

predominant common questions are whether Defendants engage in a practice of making and

attempting to collect illegal loans.

91.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained

counsel experienced in class actions and consumer credit litigation.

92.     Plaintiff's claim is typical of the claims of the class members. All are based on the

same factual and legal theories.

93.     A class action is superior for the fair and efficient adjudication of this matter, in that:

a.      Individual actions are not economically feasible.

b.      Members of the class are likely to be unaware of their rights.

-13-

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

        i.      Compensatory damages;

        ii.     Punitive damages;

        iii.    Attorney's fees, litigation expenses and costs of suit; and

        iv.    Such other and further relief as the Court deems proper.

## COUNT II – UNJUST ENRICHMENT

94. Plaintiff incorporates paragraphs 1-80.

95. This claim is against all Defendants.

96. This claim is based on all loans made to Plaintiff by Greenline Loans within five years prior to the filing of this action.

97. Defendants contracted for and collected usurious and illegal loans.

98. Defendants thereby were unjustly enriched.

## CLASS ALLEGATIONS

99. Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

100. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Greenline Loans at more than 18% interest (all of its loans qualify) (c) on or after a date five years prior to the filing of this action.

101. Plaintiff may alter the class definition to conform to developments in the case and discovery.

102. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

103. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The

predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

104.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

105.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

106.    A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.    Individual actions are not economically feasible.

      b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.    Appropriate damages;

      ii.    Costs of suit; and

      iii.    Such other and further relief as the Court deems

## COUNT III – RICO

107.    Plaintiff incorporates paragraphs 1-80.

108.    This claim is against Defendants Lorenzo and John Does 1-20, who are the RICO "persons."

109.    All loans made in the name of Greenline Loans to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the usurious rate is at least twice the enforceable rate (9%).

110.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

111.    Greenline Loans is an enterprise affecting interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet.

112.    Defendants are associated with this enterprise.

113.     Defendants conducted or participated in the conduct of the affairs of Greenline Loans through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

114.     Plaintiff were deprived of money as a result.

## CLASS ALLEGATIONS

115.     Plaintiff brings this claim on behalf of a class.

116.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Greenline Loans at more than 18% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

117.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

118.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

119.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

   a.     Whether the loans at issue are "unlawful debts" as defined in RICO.

   b.     Whether Greenline Loans is an "enterprise."

   c.     Whether Defendants are associated with Greenline Loans.

   d.     Whether Defendants conducted or participated in the affairs of Greenline Loans through a pattern of making and collecting unlawful loans.

120.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

121.     Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

122. A class action is superior for the fair and efficient adjudication of this matter, in that:

      a. Individual actions are not economically feasible.

      b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i. Treble damages;

      ii. Attorney's fees, litigation expenses and costs of suit; and

      iii. Such other or further relief as the Court deems proper.


*/s/ Daniel A. Edelman*
Daniel A. Edelman


Daniel A. Edelman (ARDC 0712094)
Tara L. Goodwin (ARDC 6297473)
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com

## **JURY DEMAND**

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## <u>NOTICE OF LIEN AND ASSIGNMENT</u>

 Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.


      <u>*/s/ Daniel A. Edelman*</u>
      Daniel A. Edelman

## DOCUMENT PRESERVATION DEMAND

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein,  any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request  that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman